Argued and submitted November 18, affirmed December 23, 1987

**HAMMACK & ASSOCIATES, INC., et al,**
*Respondents - Cross-Petitioners,*
**ELLIGSEN et al,**
*Respondents,*
*v.*
**WASHINGTON COUNTY,**
*Cross-Respondent,*
**WORLD ENTERTAINMENT SERVICES OREGON, INC.,**
*Petitioner - Cross-Respondent.*
(LUBA 87-037; CA A45960)
747 P2d 373

Joseph S. Voboril, Portland, argued the cause for petitioner - cross-respondent. With him on the briefs were Jeffrey H. Keeney and Tonkon, Torp, Galen, Marmaduke & Booth, Portland.

Mark J. Greenfield, Portland, argued the cause for respondents - cross-petitioners. With him on the brief was Mitchell, Lang & Smith, Portland.

No appearance for respondents Ralph Elligsen and Elvin H. Foster.

No appearance for cross-respondent Washington County.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

RICHARDSON, P. J.

## RICHARDSON, P. J.

Petitioner and cross-petitioners seek review of LUBA's order remanding to the county an amendment to its Rural/Natural Resources Plan. The amendment would permit petitioner and a joint venturer to construct an amphitheater and undertake other measures to develop an outdoor performing arts center on a 45-acre parcel of rural land. The county took exceptions to Goals 3, 4 and 11. However, it concluded that the proposed use is rural, rather than urban, and that it was therefore not required to take an exception to Goal 14 to allow an urban use on rural land. *See 1000 Friends of Oregon v. LCDC (Curry Co.),* 301 Or 447, 724 P2d 268 (1986). LUBA disagreed and concluded that the amphitheater is an urban use. The principal issue, raised in petitioner's first assignment, is whether LUBA erred in so concluding.

The relevant facts are stated in LUBA's opinion:

"The property includes 45.25 acres located outside the Portland Metropolitan Area Urban Growth Boundary (UGB) near the I-5 Stafford Road exit in Wilsonville, Oregon. The proposed outdoor performing arts center includes an amphitheater with 5,000 permanent fixed seats and a terraced sloping lawn above the fixed seating capable of accommodating an additional 10,000 people. The stage and fixed seating would be covered by a tent to provide shelter and act as an acoustical resonating chamber. Traffic to be generated would range from 3,750 to 9,000 vehicles, and parking would be provided on site. The center would connect to sewer and water service available on adjoining urban land from the City of Wilsonville."

In *1000 Friends of Oregon v. LCDC (Curry Co.), supra,* the court construed Goal 14 as precluding the conversion of rural land to urban use, unless the use is justified by an exception to the goal. *See also 1000 Friends of Oregon v. LCDC (Linn Co.),* 78 Or App 270, 717 P2d 149 (1986). Goal 14 defines "urban," "urbanizable" and "rural" *land,* and it is undisputed that the land in question here is rural. However, neither Goal 14 nor any other rule promulgated by LCDC defines urban and rural *uses.* That administrative silence is the strongest thing going for petitioner: But for the fact that there are no authoritative guidelines on what constitutes an urban use, there could be little doubt that an edifice which has a capacity for 15,000 people, could generate traffic up to 9,000 cars per

event, contains parking areas and is served by municipal water and sewer facilities is urban in character.

Nevertheless, the county concluded, and petitioner now urges, that the use is not urban, for the following reasons:

"(a) By virtue of the requirements of [the applicable county ordinance], outdoor performing arts centers can only be located on parcels with a minimum lot size of 40 acres. Such a parcel size would not be considered an 'urban density.' *See 1000 Friends of Oregon v. LCDC [(Curry Co.)]*, 301 Or 447 at 505, 724 P2d 268 at 305 (1986).

"(b) In terms of use and appearance, an outdoor Amphitheater is similar to the following uses which are permitted, either outright or conditionally, in the * * * zone * * *: golf courses, shooting clubs, campgrounds and private parks (an outdoor Amphitheater is probably most similar to a private park).

"(c) In terms of use and appearance, an outdoor amphitheater is similar to the following uses which are permitted in the exclusive farm use zones under ORS 215.213: churches, hunting and fishing preserves, playgrounds, campgrounds and golf courses.

"(d) The ratio of land cost to improvement cost for an outdoor performing arts center is more reflective of a rural use. The total projected cost of the Amphitheater is approximately $4.5 million, approximately $2 million of which represents land costs and approximately $2.5 million of which represents improvement cost. Urban uses typically show an improvement cost which exceeds the land cost by a much greater percentage.

"(e) Outdoor performing arts centers are more appropriately located in rural areas. Because of potential noise impacts and locational requirements, it is difficult to locate such facilities in urban areas. For this reason, most of existing outdoor performing art centers in this country are located *outside* of urban centers (e.g., Wolf Trap, Washington, D.C.; and Sandstone, Kansas City, Kansas)." (Footnote omitted.)

Reason (a) is derived from case and other authority which treat minimum parcel size as a consideration in determining whether urban or rural density will be present in an area. That is a relevant consideration when, for example, an area is zoned to permit one dwelling on a 40-acre parcel. It is specious, however, to contend, as petitioner does, that the same principle comes into operation when all or a substantial

part of a large parcel is put to a highly intense use. Under the county's and petitioner's reasoning, a shopping mall would be a rural use if the minimum lot size for it were 100 acres, notwithstanding the fact that the entire 100 acres was filled by stores and parking and traffic areas.

LUBA's response to reasons (b) and (c) was:

"Respondents note that the proposed use is similar to other uses allowed in the AF-10 Zone such as golf courses and parks. Golf courses, parks, churches, public and private schools, solid waste disposal sites, and commercial power generating facilities are permitted or allowed conditionally in EFU Zones. ORS 215.213.

"We find all of these uses can and do generate impacts that are urban in nature and may require services and facilities that are urban in nature. The fact that they are allowed in an EFU Zone does not mean they are rural. It simply means the legislature apparently made a policy decision, these uses may be a permissible use of rural EFU lands."

We agree. The legislature did not intend intense developments of all kinds in EFU zones simply because it authorized certain specified urban kinds of activities to be conducted in them. Its intent in enacting the statute relating to agricultural land was obviously the opposite.

Petitioner argues that LUBA did not even address reason (d), and that:

"The ratio of land cost to improvement cost is a very logical criteria [sic] for distinguishing between rural and urban uses primarily because it helps gauge the intensity of development represented by a proposed use."

If there is any such relationship—and petitioner directs us to nothing to show that there is—the most that it could demonstrate is that intense development is generally more costly than less intense development. However, it surely does not follow that a use which is intrinsically intense can be characterized as rural simply because the cost to develop it is less than the cost for other urban uses. The county and petitioner reason backward from an effect to a cause. Although that kind of logic might sometimes work, it does not succeed here, where there are many conceivable causes of the land-improvement cost ratio and the cause which the county and petitioner identify does not exist.

LUBA correctly said of the county's and petitioner's reason (e):

> "This may be an urban use that generates unacceptable and unmanageable offsite impacts (e.g., noise) such that it cannot practicably be located in urban areas. If that is the case, an exception may be justified to permit its location outside the urban area. Such problems do not render an otherwise urban use a rural use."

We agree.

Petitioner also contends that LUBA, and we, should defer to the county's determination that the use is rural. It relies on the statement in *1000 Friends of Oregon v. LCDC (Curry Co.), supra:*

> "The task of compiling and analyzing such data to determine its significance (if any) for identifying 'urban uses' is not for this court. Even if we were presented with the data, we would be wrong to decide whether the uses are 'urban' without analysis of the issue by the county, which is best situated to describe its authorized uses, and by LCDC, which itself adopted the goal that employs the term 'urban uses' and thus has the responsibility for developing consistent policies for evaluating what 'urban uses' means in different contexts. For example, if the county presented information comparing the proposed development with that within the UGBs, LCDC might resolve the 'urban uses' question in the manner suggested in one LUBA opinion by asking if the uses are 'of a kind and intensity characteristic of urban development' in nearby cities. LCDC might instead decide that certain commercial and industrial uses, residential densities, levels of facilities, and parcel sizes are *per se* 'urban uses' statewide." 301 Or at 506-07. (Footnote omitted.)[1]

We do not share petitioner's view that that statement suggests that LCDC, LUBA or we are bound in any way by a county's *legal* conclusion concerning the urban or rural character of a use. Indeed, the court made it clear that, in acknowledgment cases, LCDC is free to reject a county's conclusion after reviewing its data. The meaning of Goal 14 is a question of state law, and no deference is owed to a county's interpretation. *Compare Gordon v. Clackamas County,* 73 Or App 16, 698

---

[1] Petitioner quotes only part of that statement. We have quoted more extensively, in the interest of providing the full substance of the court's point.

P2d 49 (1985). We hold that the proposed use is urban, and we reject petitioner's first assignment.

Its second assignment is that LUBA "erred in holding that the county's exception to Goal 11 was inadequate."[2] Petitioner states:

> "It is apparent that this Court's resolution of the First Assignment of Error will be dispositive of the Second Assignment of Error. If this Court concludes that LUBA was correct in its characterization of the Amphitheater as an 'urban' use, then it necessarily follows that the policies of Goal 11 are violated; conversely, if this Court concludes that the County was correct in concluding that the Amphitheater would not convert rural lands to urban uses, then the policies of Goal 11 are not violated and an exception was appropriate."

Because we understand petitioner to concede that its second assignment fails if its first one does, we need not address the merits of LUBA's ruling on the exception.[3]

Petitioner's remaining assignments do not require discussion, nor does cross-petitioners' assignment.

Affirmed on petition and on cross-petition.

---

[2] Goal 11 requires counties to "plan and develop a timely, orderly and efficient arrangement of public facilities and services to serve as a framework for urban and rural development." It provides, in part:

> "[U]rban and rural development shall be guided and supported by types and levels of urban and rural public facilities and services appropriate for, but limited to, the needs and requirements of the urban, urbanizable and rural areas to be serviced."

Guideline A.2 to the goal states:

> "Public facilities and services for rural areas should be provided at levels appropriate for rural use only and should not support urban uses."

[3] Petitioner may confuse *compliance* with the goal with the propriety of the county's *exception* to it.